HURST-BOILLIN CO. *v.* FRANK KELLY *et al.*

(*Nashville.*   December Term, 1921.)

1. **APPEARANCE.** Plea in abatement to jurisdiction does not constitute appearance.

Jurisdiction can always be raised by plea in abatement, and such peal does not constitute an appearance.   (*Post, pp.* 254-260.)

2. **JUDGMENT.**   Plea in abatement in garnishment testing jurisdiction does not entitle plaintiff to personal judgment against defendant.

Where defendant filed a plea in abatement denying any interest in funds, a portion of which plaintiff sought to garnish the plea went to the jurisdiction of the court, and did not entitle plaintiff to a personal judgment because by filing such plea defendant entered his appearance.   (*Post, pp.* 254-260.)

- Case cited and distinguished:   Implement Co. v. Bank, 128 Tenn., 320.

3. **GARNISHMENT.**   Deposited draft with checking credit given depositor not subject to garnishment for depositor's obligations.

Where a draft was deposited in a bank and full checking credit given depositor for draft, which was then forwarded for collection for the bank, the draft was not subject to garnishment in an action against depositor for alleged breach of warranty in goods for which draft was paid.   (*Post, pp.* 260-261.)

Acts cited and construed:   Acts 1899, ch. 94.

Code cited and construed:   Sec. 3516a69 (S.).

FROM MONTGOMERY.

Appeal from the Chancery Court of Montgomery County. —HON. J. W. STOUT, Chancellor.

SAVAGE, DANIEL & SAVAGE, for appellant.

AUSTIN PEAY, for appellees.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

Complainant, wholesale grocers at Clarksville, filed this bill against Frank Kelly, a resident of Lexington, Ky., and the Northern Bank of Tennessee, a. Clarksville banking corporation, in which it alleged the purchase of a car of beans from defendant Kelly for $3,765.44, represented by draft attached to bill of lading which it had paid, the proceeds of which belonged to Kelly, and which was in possession of said Northern Bank of Tennessee. It alleged that .said beans were inferior in quality and that they did not come up to warranty, and that the contract had been breached to its damage in excess of $1,000, ana it undertook by garnishment proceedings to appropriate a sufficient amount of said funds to the payment of its claim.

Kelly filed a plea in abatement, denying that the fund in bank belonged to him.

An intervening petition was filed by the Bank of Lexing·ton, Ky., in which it was alleged:

"That it is a banking corporation, incorporated under the laws of the State of Kentucky, engaged in the banking business at Lexington, Ky., and has been so engaged for a number of years; that on or about September 27, 1919, a certain draft for $3,765.44, drawn by the defendant Frank Kelly, on the complainant, Hurst-Boillin Company, and payable to the petitioner, was negotiated to the petitioner by the said Frank Kelly in the due course of trade, and for a valuable consideration, and that attached to the said draft was a bill of lading covering a carload of beans shipped to the complainant.

"That the petitioner forwarded the said draft for collection for its own account through its correspondent, the

Fifth and Third National Bank of Cincinnati, Ohio, and is advised that the draft was then forwarded through the Fourth and First National Bank at Nashville, Tenn., to the defendant Northern Bank of Tennessee, Clarksville, Tenn.; that the complainant paid to the Northern Bank of Tennessee, the face of the said draft, taking up the same, together with the bill of lading thereto attached; and that immediately after payment to the defendant Northern Bank of Tennessee the complainant attached the proceeds of the draft, the sum of $3,765.44, in the hands of the defendant Northern Bank of Tennessee.

"That the petitioner knows nothing whatever of the contract entered into by the complainant with the defendant Frank Kelly, or of any warranties made by the said Kelly as to the quantity or quality of the beans covered by the bill of lading attached to the draft; that it cannot state whether or not the merchandise covered by the bill of lading measured up to the warranty, made by the defendant Frank Kelly, if such warranty was in fact made; and that it is advised that its rights cannot be in any way prejudiced or affected by any warranty made by the defendant Frank Kelly to the complainant or by any breach of such warranty.

"That at the time of the attaching or impounding of the proceeds of the said draft, October 4, 1919, the defendant Frank Kelly had no interest whatever in the said draft or the proceeds thereof, and had had no such interest since the date the draft was drawn; that, as stated above, the petitioner was, from and after the date of the drawing of the draft, the *bona-fide* holder of same, having obtained it for a valuable consideration and in the due course of trade; and that since the draft showed on its face that it

was the property of the petitioner, and since it was in fact the property of the petitioner, and since the defendant Frank Kelly was not the owner of, or. entitled to, any part of the proceeds thereof, the proceeds of the said draft were not subject to attachment by the complainant for any amounts which the defendant Frank Kelly might owe to the complainant, or for any other obligation of the said Frank Kelly."

Upon the hearing the chancellor dismissed complainant's bill, and it has appealed, and has assigned numerous errors.

The first question raised by complainant is that in any event it is entitled to a personal judgment against Kelly for the reason that, by filing said plea, he entered his appearance.

To this we cannot consent. The plea went to the jurisdiction of the court. If the fund did not belong to Kelly, then the court had no jurisdiction, and jurisdiction can always be raised by plea in abatement. The burden was upon complainant to prove that this fund belonged to Kelly. This it has not done.

Complainant relies upon *Implement Co.* v. *Bank,* 128 Tenn., 320, 160 S. W., 848, in which the court said:

"The question for decision is whether the Mercantile National Bank became the absolute owner of the draft, or whether the draft was received by it only for collection.

"This is to be determined by the intention of the parties, as evidenced by their acts. We are of the opinion that the agreement to charge back in case the paper should be returned is a controlling consideration. It is irreconcilable with absolute ownership on the part of the bank. An agreement in advance to charge back on failure of collection imports necessarily only a limited ownership, as in case of a bailment."

Under the facts of that case the court held that the bank received the paper only for collection, which was based upon the express agreement to charge back.

In the instant case no such agreement was proven. On the contrary the cashier, F. G. Stilz, testified. as follows:

"Q. 5. State whether or not some time in September, 1919, Frank Kelly negotiated to your bank a draft on complainant, Hurst-Boillin Company, at Clarksville, Tenn.?

"A. Yes, sir; he did, on September 27, 1919.

"Q. 6. How were the proceeds of the draft conveyed to him, by deposit or otherwise?

"A. By deposit.

"Q. 7. Have you a copy of the original deposit slip?

"A. I have the original deposit slip.

"Q. 8. Will you hand that to the stenographer and mark it Exhibit No. 1, to your deposition?

"A. Yes.

"Q. 14. Was the draft left for collection or was he allowed to check on the fund?

"A. He was allowed to check on it.

"Q. 15. State whether or not he did check on it?

"A. He did.

"Q. 16. When were you first notified that the Cincinnati Bank had charged you up with the proceeds of this draft?

"A. On October 6th, by telephone first.

"Q. 17. After receiving this notification, did you see the defendant Kelly?

"A. Yes.

"Q. 18. Please relate what transpired when you talked to him about the matter.

"A.   I told him what the Fifth and Third National Bank of Cincinnati had told us about the money being attached; I told him that he would have to make the amount good. He said he couldn't do it; refused to do it; he had never heard of such a transaction. I told him very frankly that I never heard of such a transaction myself, but it had been done.

"Q.   19.  Did he make the draft good?

"A.   No, sir.

"Q.   3.  When this draft was deposited, state whether or not you had any arrangement with Kelly by which, if such a state of facts arose as did arise, you might charge this draft back to his account.

"Mr. Peay:  This question is leading; it is objected to.

"Mr. Daniel:  I will change the form of the question. State what arrangement you had with the defendant Kelly when he deposited the draft, if you had any arrangment.

"A.   No arrangement.

"Q.   24.  Have you ever charged or attempted to charge this draft back to his account?

"A.   No, sir.

"Q.   25.  Did you request that he allow you to do this when you found that the proceeds of the draft had been stopped?

"A.   Yes.

"Q.   26.  State whether or not he agreed to this.

"A.   No; he did not.

"Q.   27.  As the matter now stands, what interest has Kelly, if any, in the proceeds of this draft?

"A.   He hasn't any.

"Q.   72.  They were handled precisely as all collection items are handled through your bank?

"A.   We have two departments here; we have the cash items department and the collection items department. Our collection items are items that are left with the collection clerk, which are charged for collection. This item was credited on the 27th day of September; we charged so much to the Fifth and Third National Bank that day; Frank Kelly received the proceeds of the draft.

"Q.  73.  In other words, when there is an item handled by your bank for a customer and for collection, it is optional with you whether you obtain collection on that item before giving him credit or whether you give him credit at the time the item is deposited with you?

"A.   We never give a customer credit for a collection item until that is reported paid.

"Q.  74.  Did you derive any profits from this transaction with Kelly?

"A.   No, sir.

"Q.  92.  What was the duties of the officer who handled this item for your bank?

"A.   He was acting teller, A to K teller at that time; assistant cashier.

"Q.  93.  What duties does he perform in that position?

"A.   Receiving deposits, paying checks.

"Q.  94.  No other?

"A.   That was practically his duties.

"Q.  95.  Then he is not in the habit of making loans or buying paper for your bank?

"A.   Except in the absence of the cashier.

"Q.  96.  Where were you on the day of this transaction?

"A.   I think I was in the bank, I am not sure now.

"Q.  97.  Mr. Stilz, your bank never intended to buy this draft, did it?

"A. The arrangement we had, Mr. Peay, with Mr. Kelly, when Kelly began doing business here—I knew the nature of his business—he asked me if we would protect his account. We told him we would if the bank could safely do so. He said that all he would ask for us to handle was bill of lading drafts for him, which we were in the habit of doing. He comes in now, deposits those drafts to his credit—some of them we charge a discount on, some we do not. If the draft is held up, not paid promptly, we usually charge him reasonable interest on it.

"Q. 98. But you don't buy them outright from him?

"A. We give him money on them.

"Q. 99. But you don't buy them outright from him so as to release him from responsibility?

"A. We don't release him on the draft; no, sir; if the draft is returned, of course, we make him take it up, charge it to his account if we can.

"Q. 127. In the event you fail in this attachment suit, would you expect Kelly to make good to you this amount?

"A. I would try to get him to; yes, sir.

"Q. 128. You consider that he is legally responsible to your bank in case you do not receive the proceeds of this draft?

"A. I do not think he is responsible for that much money; I don't think we could make it of him.

"Q. 129. You are not answering my question. My question is, in the event you fail in this attachment suit, in case you do not receive the proceeds of this draft, are you looking to Kelly to make it good to you?

"A. I do not believe he would be legally responsible to us.

"Q. 130. Are you looking to him or not?

"A. No, sir; I am not looking to him at all.

The assistant cashier, H. A. Stilz, who handled this transaction, and who was a witness for complainant, testified as follows:

"Q. 8. Under whose instructions do the men at the teller's windows handle transactions such as this?

"A. Cashier.

"Q. 9. State whether or not the cashier had issued instructions as to how these transactions should be handled, and, if so, what instructions he issued.

"A. Why, the tellers have instructions to have these— any draft that comes in put to a man's credit, cash item, bill of lading attached, O. K.'d by the cashier, or assistant cashier, if he is not here.

"Q. 10. What restrictions, if any, were placed on Kelly's checking on such drafts?

"A. He checked on them the same as if it was a check handled as a cash item.

"Q. 11. State whether or not this draft with bill of lading attached was handled in accordance with those instructions.

"A. Yes, sir.

"Q. 18. Do you have any recollection of this individual transaction?

"A. No, sir.

"Q. 19. All you know about it is—

"A. The record is all.

"Q. 20. All you know about it is that this entry in Kelly's passbook is in your handwriting?

"A. Yes, sir.

"Q. 21. You don't remember under what circumstances you handled this item?

"A. I know it is handled as cash.

"Q. You mean all deposits of Kelly?

"A. I mean all deposits with bill of lading attached.

"Q. 23. You handle a great many such items for him?

"A. Yes, sir.

"Q. 24. What became of this item after it was received at your window?

"A. It goes through to the proof clerk; goes out on the foreign mail.

"Q. 25. For collection?

"A. Yes, sir; just the same as any other check; he gets credit for it; goes out to the foreign department; goes on through the mail with the other checks, cash items.

"Q. 26. If it comes back, what occurs?

"A. Notify him and charge it back to him."

There is no evidence by either of these parties that this draft was received for collection, or that it was agreed at the time that if the draft were returned it should be charged to Kelly.

In the Implement Case the court further said:

"All that the bank can justly claim is that it be fully protected against loss."

And the court undertook to show that under the agreement the bank could protect itself. But here there is no such agreement. Kelly denied the right of the bank to charge him with this draft.

Section 61 of the Negotiable Instruments Act (chapter 94, Acts of 1899 section 3516a69 of Shannon's Annotated Code) is as follows:

"The drawer, by drawing the instrument, admits the existence of the payee and his then capacity to indorse; and engages that on due presentment the instrument will be

accepted or paid, or both, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser who may be compelled to pay it. But the drawer may insert in the instrument an express stipulation negativing or limiting his own liability to the holder."

When the draft was paid the drawer, Kelly, was no longer bound, his guaranty had been fulfilled, and the Bank of Lexington had no right to charge him with this fund. Upon the draft being paid the fund belonged absolutely to the Bank of Lexington, and Kelly had no interest therein. This is not a case where the draft was deposited for collection.

There is no significance in the statement of the assistant cashier that the draft was forwarded for collection. That was true. He did not state, however, that it was forwarded for collection for Kelly. The bill charges, and we find from the evidence, that it was forwarded for collection for the bank.

Neither is any importance to be attached to the statement of the assistant cashier that if the draft came back it would be charged to Kelly. He would have that right because Kelly had guaranteed its payment. But it did not come back, but was paid, and Kelly had fully complied with his agreement.

We find no error in the decree of the chancellor, and it will be affirmed.